Jeremy Kamras and at Council's table, Jonathan Hughes of Howard Rice, Nemirovsky, Kennedy, Falk, and Radkin on behalf of the petitioner, Vijanti Devi Sharma. I'd like to reserve three minutes for rebuttal. Okay. The honors, Mrs. Sharma petitions for review from two motions to reopen, or from the BIA's denial of two motions to reopen, one to apply for adjustment of status and the other to apply for asylum and withholding of deportation on the basis of changed country conditions. There is no question that Mrs. Sharma qualifies for adjustment of status and the government does not contest that she submitted sufficient evidence in her application or in her motion to reopen to meet the relatively lax standard there, namely that there is a reasonable likelihood of success on the merits, nor could it. Mrs. Sharma has been married for nearly over 13 years. She has an approved visa petition. As married to a United States citizen, she has an immediately available visa and the bonafides of the marriage cannot be questioned. As I said, Mrs. Sharma has been married to her husband for over 13 years. They have had a child together. They remain married today. Likewise. What do you do about the timeliness issue? Certainly. Fundamentally, that is the government's argument that the motion to reopen was filed untimely and putting aside for the moment the question of whether the deadline was equitably pulled, even if it were untimely filed, there is the fact that it was the result of ineffective assistance of counsel. The government does not contest that ineffective assistance of counsel can excuse an untimely filed motion to reopen. Did you exhaust that with the board? The issue was not raised. The issue was not was not squarely raised before the BIA, but there were facts on the record, which would have given the BIA the opportunity to address that issue. And certainly this court has held that particularly in a pro se filing as was the case here, a petitioner need not raise the issue in quite the direct way that would be expected. Otherwise, further, this court has held that in the context of an ineffective assistance of counsel claim that rises to the level of a due process claim, which is the case here, that where that claim could not be corrected by the BIA, that it need not be exhausted before the BIA. But doesn't she have to follow the procedures in the Lozada case in order to get that properly before us even? Not necessarily. This this court has held on numerous occasions that the Lozada requirements are quote not sacrosanct and that where the the evidence that would be that that would result from complying with the Lozada requirements are plain on the face of the record that the requirements need not be met. And in fact, only a few months ago in Granada, Soceguera, this court held that a petitioner was able to bring her ineffective assistance of, or his, I should say, ineffective assistance of counsel claim despite having not exhausted it below and not having complied with the Lozada requirements below. That case, in fact, is very much on point here and and holds that an ineffective. So where is the evidence on the record that would allow us to find that she was, that she had ineffective assistance of counsel? The evidence on the record is that she was, it's actually quite similar to the evidence that was on the record in Granada, Soceguera. Would you tell me, say that case? It's Granados, G-R-A-N-A-D-O-S dash Soceguera, O-S-E-G-U-E-R-A, and the site is 464 F 3rd 993. It was decided in September of last year. And just as in Granada, Soceguera, the facts on the record were that the petitioner had a likelihood of success on the merits as to her motion to reopen and that it was that the counsel should have known importantly in Granada, Soceguera, the court emphasizes the fact that Where is the evidence that the counsel should have been known? Who was the counsel? This would have been 1995, is that right? Armando Salazar was the counsel. And in Granada, Soceguera, the court explains that the mere, that counsel should have known by virtue of the fact that the rules regarding timeliness were well known. And here it's also the case. Is there something in the record that tells us that Mr. Salazar was employed during all of this period? We know that he was employed by the petitioner at least through July of 1996. And do we know what Ms. Sharma told him about her marriage? We don't know what Ms. Sharma told him about the marriage. Then how would we know on the record that he was ineffective in failing to advise her that she had 90 days to apply to reopen this matter because of her marriage? We know that she was married in early 1994, that it was in the midst of the original asylum proceedings during which Armando Salazar also represented Mrs. Sharma. Okay, but where is the evidence that Salazar knew that she was married? If it's plain on the record, where does the record tell us that Salazar knew that she was married and failed to advise her at a time when he had an obligation to tell her? And therefore you're excused from Lozada. Right. We also know that Mrs. Sharma attended the original deportation hearing with, I believe it's with her husband, and there is the deportation hearing, of course, where they unfortunately appeared late and therefore was held in absentia, ultimately resulting in her being ordered deported. He wasn't a citizen at the time, though, of the hearing. He was not a citizen at the time of the hearing. He was naturalized. That was two years later, wasn't it? Well, he was naturalized in 1995, I believe. 1996. I have it. He was naturalized on March of 1996, and the hearing occurred in 1994. That's correct, but that's true. But the proceedings, he had been, the approved visa petition was in 1995, of course, and the proceedings that were arising from the absentia hearings lasted through April 1995. So throughout this entire course of time, from late 1994 through 1996, Armando Salazar had repeated contact with the petitioner. During that same time, she was married. During that same time, or a little bit thereafter, that is in 1995, she had an approved visa petition and ultimately, and was married to a permanent resident who ultimately became naturalized in 1996. And Armando Salazar was representing her through at least July of 1996. So you're saying it's a fair inference from those circumstances that the counsel who was representing her would know she was married? Certainly. I think it's certainly a fair inference based on the contact that he would have had with her during that time. Counsel, one of the reasons that we have the Lozada proceeding though, is to give counsel an opportunity to respond to such accusations, so that you don't get to come in here sort of one- sided and say, there's a lawyer here who's a lawyer and committed malpractice, and we're going to do it on the basis of these inferences. And the exceptions that we have to Lozada are in those cases in the face of the record that we've got ineffective assistance of counsel. How can we do that in this case and sort of slander Mr. Salazar without even giving him an opportunity to say, I didn't know she was married. Here's the days I had contact with her, and I knew she had somebody with her, but it was never clear to me. Don't worry. This is a judicial proceeding, so you can't be sued. I appreciate that. I'm not sure I was worried, but my colleague might have been. Maybe you can make a deal and you'll testify against him and I'll drop you. At a minimum, again, under Granada-Sarceguerra, this court has the opportunity to remand so that the Lozada requirements can be complied with before the BIA. So even if this court were to be concerned about that issue and wanted the ineffective assistance of counsel claim fully vetted, it could do so there. I see that I have only a minute remaining, so I'll reserve that for rebuttal. Thank you, Mr. Chairman. May it please the Court, I'm Lionel Jensen for the government. Good morning. I will first address the adjustment of status motion, then move on to the asylum motion, since I don't get rebuttal and I need to make sure everything's covered. There is nothing in this record that shows that the attorney, Mr. Salazar, knew that Mrs. Scharmer was married. In fact, although Petitioners or counsels just said that her husband went with her to the deportation hearing, that's not in the record. I'm not sure where that comes from, but there's no indication of what he knew. There's also another problem which counsel has failed to acknowledge, but which Scharmer herself did. Because Scharmer was found deportable in absentia after receiving oral and written warnings under former Section 128 U.S.C. 1252b, she was ineligible to apply for adjustment of status for five years after the final order. The immigration judge specifically advised her of that, and if you look at page 227 in the motion to reopen that she submitted, which was pro se, she acknowledges that she understood that, the five-year bar. To say that Mr. Salazar should have filed an adjustment of status application when, in fact, she was ineligible for something defies logic. You know, this whole case defies logic. I mean, it's almost a nightmare of a case, really, when you think about it, because her original petition had it – I mean, she was 40 minutes late for the hearing. The judge was still holding the hearings. He wouldn't hear from her. He deports her in absentia, even though she's there. And then, of course, our court affirms that. And she's married to a naturalized U.S. citizen. She has a U.S. citizen job. She might have two, but on this record, she has one. She was clearly eligible for relief back then. She would be eligible for relief, but for these timeliness, numerical, and other bars. And I just don't understand why the INS would want to deport someone like this. First of all, Your Honor, she was not clearly eligible for any relief at that period of time. Whether or not she – her husband had submitted an I-130 to her, because she'd been in removal proceedings at the time, she would have had – I'm saying if you look at her original asylum – if anyone had looked at her original asylum application, she clearly meets the past persecution. And the condition – country conditions at that point were pretty terrible for endohesions. Your Honor, we request that you look at pages 99 and 287 of the record, which is, in fact, her one-page, unsworn declaration, which is, as I would put it, fact-deficient as to what happened. But she didn't have a hearing. No. She didn't have a hearing. And the law of the case is that she was properly found removable. I'm saying let's put aside all this technical stuff. Why – why wouldn't you look at her claim on the merits? Even if you did, on what we have, which in this record, which is what all we have and which all the Court has, she has not shown eligibility for asylum. She has an unsworn statement that essentially states – All right. Put aside asylum. How about based on her marriage? Well, again, at the time of the hearing, even if Mr. Salazar had known that she was married, her husband – she had not shown that she was eligible. And on the facts at that time – I'm saying what you know now. I'm saying you're a representative of the Department of Homeland Security based on what you know now are the facts. And the proper remedy would have been to file – to go back to ICE and ask them to join you in a motion to reopen to the immigration. Is that what she needs to do? But they never did that. Okay. So they bypassed everything. Excuse me. Let me just ask you, before you start condemning their actions, I mean, you have to remember she was pro se for a long time and she had a lawyer, somewhat questionable, okay? I mean, when you show up 40 minutes late for a hearing. But, okay, so today she could go back to ICE and ask them to join in a motion, or is it too late to do that? No, it's never too late. I don't know what ICE would do.  Now, who's ICE? Immigration and Customs Enforcement. In other words, she's got to go back to the agency, not to this Court. And it shouldn't have been to this Court. She never tried to go back to the agency with that. Maybe she didn't. She filed a motion to reopen. It was grossly out of time. Didn't ask them to join in. But the point is there's got to be an end point of litigation. This has been going on for 12 years now. She was found removable or deportable in absentia. She had the right to appeal that to the BIA. She did. They disagreed with her, and they found it was valid. She had the right to petition this Court for review, and this Court, in fact, affirmed the BIA. She did not leave. You're not telling us anything we don't know. All right. But she hung on for three years, when in fact, and she had a child when she was removable, knowing the risk. Now it's 12 years later, motions to reopen are looked upon with disfavor. It's just extended and extended and extended. At this point, going back to the asylum application, we know that she herself, through counsel, submitted a 2002 State Department report saying that conditions had pretty much reverted back to what they were in Fiji, that there was no more problems the way that she was complaining about. She was not eligible for asylum at that point. She had not shown a change of material circumstances. Now she's -- But she did, in this second motion, she did show that there was another uprising and the Indo-Fijian president was kicked out. And so there was another kind of ---- You're talking about 2000 or the one later. Right. But she didn't. I agree with your argument that she did fail to individualize that to her particular circumstances. But there was ---- I mean, the country conditions for Indo-Fijians had ---- there was a time when they were fairly good, and then they got worse again, and that was the subject of this motion, right? That was. But by the time the motion got to the BIA, she herself had submitted a country report dated 2002 which had said that the bad conditions from the year before no longer persisted. You would also know ---- Let me ask you another question. Is there, other than going to ICE and asking them to do a joint motion, is there ---- are there any other avenues of relief for someone in her position? She could probably, when she goes back to Fiji, go to the consulate and apply to come back here. But that's going to take time. That's a proper remedy, you know, to do it. I can't say whether it will be granted or not. That's a discretionary type thing. You know, my only concern here, and the government's only concern here, is that the issue of adjustment of status isn't before the Court. It's whether the BIA abused its discretion in denying an untimely motion. Petitioner herself states in her brief, this is neither the time nor place, because it's not for this Court to do. We understand our position. I'm just asking you about alternatives. And the only two I can come up with are she can go to ICE and ask them to join in the motion, but, of course, they're not required to do that, or she can comply with her removal order, depending, obviously, of course, what this Court does. If the Court does not affirm below, you know, the decision below, then she's not going to be removed. But she could comply with that and go back to the consulate with her I-130, showing that she's married, and go through the normal procedure that any immigrant or intending immigrant who lives overseas would have to do. I'm assuming she has a stay of departure. I believe she does, Your Honor. At any rate, she's here, and she's not in detention. Right. Right. So, so, and did she get voluntary departure? No. She did not apply for voluntary. Well, because it was in absentia, the answer is no, Your Honor. Okay. As I say, and we haven't really touched upon the asylum issue yet, and I've only got a minute to do so, but Your Honor has touched upon it, that she has not shown in which she submitted an individualized risk. There was no abuse of discretion in denying the asylum application. We have covered that in depth in the brief, and we would rely on the brief for that, because I do say I'm out of time. In summary, we would ask that you affirm the decision below that you deny this petition for review. Subject to your further questions, that will conclude my argument. Thank you. Thank you, Your Honor. Thank you, Mr. Jensen. Mr. Kammers, you've got, I believe, a minute or so left. Thank you, Your Honor. First, with respect to the 5-year bar, we address this point at page 32, footnote 14 of our opening brief, where we explain that under this circuit's precedent, the fact that Mrs. Sharma appeared tardy to her hearing does not necessarily constitute a failure to appear under Section 1182. And I would refer Your Honors to that footnote if that point troubles you. With respect to the motion to reopen on the basis of changed country conditions, fundamentally, the government's argument is that the BIA was correct to ignore the evidence of individualized risk that Sharma had previously submitted. That evidence does suffice to show individualized risk, at least as to a motion to reopen, where I remind the Court that the standard is fairly lax. She need only show a reasonable likelihood of success on the merits. And once and if this Court were to grant remands with orders to reopen the proceedings, the final deportation order would be vacated such that any motion to reopen, for example, to adjust for time for to move for adjustment of status, would no longer be untimely. With that, I ask this Court to, unless there are any further questions, grant the petition for review and remand to reopen the proceedings. Thank you. Roberts. Thank you. Thanks, both counsel. The case just argued is submitted. Mr. Cameron, we especially want to thank you. I know you've accepted appointment of this case from the Court on a pro bono basis. We appreciate your having done that and your conscientious attention to it. I affirm. Thank you. 0556219, Nguyen v. Immigration and Naturalization Service. Each side is allotted 10 minutes. 0556214, Nguyen v. Immigration and Naturalization Service.
judges: Silverman, Wardlaw, Bybee